1

2

3                           UNITED STATES DISTRICT COURT

4                          NORTHERN DISTRICT OF CALIFORNIA

5

6    A.P.,                                      Case No.  18-cv-07140-JCS

7                    Plaintiff,
                                                **ORDER REGARDING MOTION FOR**
8          v.                                   **SUMMARY JUDGMENT AND**
                                                **MOTION TO REMAND**
9    ANDREW SAUL,
                                                Re: Dkt. Nos. 23, 28
10                   Defendant.

11   **I.      INTRODUCTION**

12          Plaintiff A.P.[1] moves for summary judgment on his claim that Defendant Andrew Saul,

13   Commissioner of Social Security (the "Commissioner") erred in denying A.P.'s application for

14   disability benefits.  A.P. seeks an order instructing the Commissioner to award benefits under the

15   Ninth Circuit's credit-as-true doctrine.  The Commissioner concedes that the administrative law

16   judge ("ALJ") who denied A.P.'s application erred, but moves to remand the case for further

17   administrative proceedings.  For the reasons discussed below, A.P.'s motion is GRANTED, the

18   Commissioner's motion is DENIED, and the case is REMANDED for calculation and award of

19   benefits.[2]

20   **II.     BACKGROUND**

21          **A.    A.P.'s Medical History**

22          A.P. grew up in foster care and suffered physical and sexual abuse during his childhood

23   and early adulthood, and has been homeless for much of his adult life.  He has a history of

24

25   _____
     [1] Because opinions by the Court are more widely available than other filings, and this order
26   contains potentially sensitive medical information, this order refers to the plaintiff only by his
     initials.  This order does not alter the degree of public access to other filings in this action
27   provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule
     5-1(c)(5)(B)(i).
28   [2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
     purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1    depression with hallucinations, which began during his teenage years.  *See* Administrative Record

2    ("AR," dkt. 22) at 399.  This summary focuses on the evidence cited by the parties and relevant to

3    the resolution of the present motions, and is not intended as a complete recitation of the

4    administrative record or A.P.'s medical history.

5          When A.P. was incarcerated at the Santa Rita Jail in September of 2007, he complained of

6    psychological issues including auditory hallucinations.  *Id.* at 421, 423, 426–27.  Mental health

7    treatment notes indicate that A.P. reported using alcohol occasionally and no other drugs, although

8    he had used cocaine in the past.  *Id.* at 421.

9          In February of 2010, A.P. was picked up by police for purportedly agitated behavior,

10   including "banging on doors" and "yelling," although A.P. stated that he was only walking down

11   the street.  *Id.* at 554.  After being transferred from an emergency room to the John George

12   Psychiatric Pavilion, A.P. reported no hallucinations and no past psychiatric diagnosis, but the

13   person who competed his intake evaluation wrote that he smelled of alcohol and was at times

14   unintelligible, and that he likely had past psychiatric diagnoses but was a poor historian.  *Id.*  A.P.

15   stated that drank alcohol once per week and used cocaine whenever he could, "perhaps weekly."

16   *Id.*

17         Mental health treatment notes from another short period of incarceration at the Santa Rita

18   Jail in June of 2011 indicate that A.P. had a "significant" history of alcohol and cocaine use, that

19   he reported using alcohol twice per week and cocaine occasionally (most recently around one

20   month earlier), and that he stated, "cocaine is a great drug, it settles me down."  *Id.* at 418–19.

21   Those notes also reflect A.P.'s auditory hallucinations.  *Id.* at 418–20.

22         A case manager brought A.P. to the John George Psychiatric Pavilion on May 13, 2014

23   because A.P. reported thoughts of harming himself.  *Id.* at 584.  Dr. Dennis Barton, M.D., wrote

24   that A.P. "was feeling like harming himself (without specific plan)," but felt safer in a treatment

25   setting.  *Id.*  Dr. Barton wrote that it was "[u]nclear . . . how much of his diagnosis is endogenous

26   or related to underlying substance abuse and subsequent withdrawal symptoms of cocaine," but

27   that A.P. did "not have any signs of withdrawal, including stable vital signs," and separately that

28   A.P. "show[ed] no active signs of withdrawal."  *Id.*  Dr. Barton discharged A.P. to Bay Area

United States District Court
Northern District of California

2

1    Community Services' ("BACS") Woodroe Place Crisis Residential facility, where he received

2    inpatient treatment from May 13 to May 27, 2014.  *Id.* at 1073–88.  A counselor's note at the time

3    of A.P.'s admission recites verbatim Dr. Barton's note regarding uncertainty as to whether A.P.'s

4    symptoms were related to withdrawal from cocaine.  *Id.* at 1073.  Treatment notes reflect

5    improvement and stabilization in that structured setting, but even on the day before his discharge,

6    A.P.'s "Axis V" Global Assessment of Functioning ("GAF") score was 50, indicating serious

7    symptoms or impairments.  *See id.* at 1088.

8           On September 30, 2014, psychiatric nurse practitioner Brian Whiteside completed a

9    "mental impairment questionnaire" diagnosing A.P. with depression and PTSD.  *Id.* at 846.  He

10   indicated that A.P. had flashbacks and intrusive thoughts, difficulty thinking or concentrating, and

11   emotional withdrawal or isolation, among other symptoms.  *Id.* at 846, 848.  Whiteside checked a

12   box indicating that A.P. experienced hallucinations or delusions, but added a note reading "treated

13   with meds."  *Id.* at 848.  Whiteside reported that A.P. was "Seriously Limited, but not precluded"

14   with respect to several categories of work-related mental abilities, but did not choose the more

15   severe assessments of "Unable to Meet Competitive Standards" or "No Useful Ability to

16   Function" for any such categories.  *Id.* at 849–50.  He assessed marked limitations with respect to

17   concentration, persistence, or pace, but only moderate limitations with respect to activities of daily

18   living and social functioning, and reported that A.P. had experienced one or two episodes of

19   decompensation lasting at least two weeks during the previous twelve months.  *Id.* at 850.

20   According to Whiteside, A.P.'s impairments or treatment would cause him to miss about four days

21   of work per month; his impairments were not caused by substance intoxication, dependence, or

22   withdrawal; and his impairments would remain as severe in the absence of substance use.  *Id.* at

23   847.

24          Psychologist Lisa Kalich also evaluated A.P. on September 30, 2014.  *Id.* at 689.  Dr.

25   Kalich reported that A.P. isolates himself and is not comfortable with crowds, and that he

26   experiences periods of depression in which he sometimes goes days or weeks without bathing or

27   changing clothes.  *Id.* at 690.  He began to experience hallucinations as a young teenager, first

28   believing that he could see ghosts, and later hearing voices, which intensified in his adolescence

United States District Court
Northern District of California

3

and has continued during his adult life.  *Id.* at 691.  A.P. has sometimes acted on commands of the voices he hears, including one incident where he assaulted a stranger.  *Id.* at 691–92.  He began to have suicidal thoughts as a young child, which have recurred throughout his life; he attempted suicide once during his childhood and has been hospitalized as an adult for suicidal ideation.  *Id.* at 691.  When he was employed, he "intermittently miss[ed] work due to depression once or twice per month," and typically quit his jobs when his depression became more severe.  *Id.* at 690.  Dr. Kalich determined that A.P. had intermittently marked impairment in activities of daily living (which, in her view, would prevent him from adhering to a typical work schedule), moderate to marked impairments in social interactions, and likely intermittent severe defects in concentration and attention due to his hallucinations and panic attacks, although his concentration was not impaired on the tests that Dr. Kalich conducted.  *Id.* at 694–95.  Dr. Kalich stated that A.P.'s symptoms had worsened over time and "the course of his illness has been marked by episodes of decompensation," but that at the time of the evaluation his symptoms had stabilized due to consistently taking his medication and decreasing his use of alcohol and drugs.  *Id.* at 695.

A.P. reported to Dr. Kalich that he drank extremely heavily from the time he was a teenager—resulting in an involuntary psychological hold and, on a separate occasion, an arrest for child endangerment—but he cut down his alcohol use beginning in November of 2013 to one to three times per month.  *Id.* at 691.  He reported that he began using cocaine, which calmed him and helped him concentrate, when he was 32 and uses it a few times per month, and that he previously used marijuana but had ceased doing so because it exacerbated his depression.  *Id.*  Dr. Kalich stated that A.P. has received mental health treatment "[o]ff and on since 2005," and that he used alcohol heavily in conjunction with his psychotropic medication for many years since then, but found his current prescriptions "effective in partially alleviating his symptoms."  *Id.* at 692.  She wrote that his alcohol use likely exacerbated his depression and that his cocaine use might contribute to mood fluctuations, but that because his "symptoms of depression and anxiety have persisted during periods of reported sobriety and decreased use, it is unlikely that his symptoms are the sole product of his use."  *Id.* at 694.

On October 27, 2014, A.P. failed to appear for a psychological examination with a

4

United States District Court
Northern District of California

1   consultative examiner arranged by the California Department of Social Services in conjunction

2   with A.P.'s application for Social Security disability benefits.  *Id.* at 698.

3        Treating psychologist Roya Sakhai and another staff member at Multi-Lingual Counseling,

4   Inc. completed an assessment form for A.P. on November 18, 2014.  *Id.* at 826.  Dr. Sakhai

5   diagnosed A.P. with severe major depressive disorder with psychotic features.  *Id.* at 827.  Dr.

6   Sakhai noted that A.P. "hears voices telling [him] to hurt himself and others, or making

7   disparaging remarks about him," and "says he can hear people's mind talking to him," leading him

8   to isolate himself.  *Id.* at 829.  Dr. Sakhai rated A.P. as having the highest level of need for

9   services in every category listed on the form, specifically: (1) living arrangements;

10  (2) "prevent[ing] difficulties in education/employment/day/social activities"; (3) maintaining

11  relationships and social support; (4) hygiene and medication management; (5) psychotic

12  symptoms, suicidal ideation or acts, or violence towards others; and (6) "high risk of recurrence to

13  a level of functional impairment."  *Id.* at 833.  A.P. reported that he had problems with drinking in

14  the past but only drank socially at the time of the evaluation, and that he had used other drugs "on

15  and off" but "never had any problem" with them.  *Id.* at 834.

16       In January of 2015, in the context of the initial denial of A.P.'s application for disability

17  benefits, state agency consultant Dr. Elizabeth Covey, Psy.D., determined that A.P. had severe

18  affective disorders and non-severe substance addiction disorders, causing only mild to moderate

19  limitations.  *Id.* at 110–15.  Dr. Covey determined that Dr. Kalich overstated the severity of A.P.'s

20  symptoms and that A.P. could perform his past work as a janitor.  *See id.*  Despite diagnosing a

21  non-severe addiction disorder, *id.* at 110, Dr. Covey separately wrote that there was "no evidence

22  of any substance abuse disorder/DAA [i.e., drug addiction or alcoholism] issue," *id.* at 116.  On

23  reconsideration of A.P.'s application in June of 2015, Dr. F.L. Williams, M.D., and Dr. A. Ahmed,

24  M.D., reached largely the same conclusions as Dr. Covey.  *Id.* at 139–45.

25       In March of 2015, A.P. reported at a follow-up appointment with nurse practitioner

26  Whiteside that he was facing eviction and homeless, and that he had passed out on a San Francisco

27  sidewalk while binge drinking.  *Id.* at 700.  Whiteside reported that A.P. was within normal limits

28  on a number of metrics, but his mood was depressed and anxious, and his judgment was affected

5

1   by an "[i]mpaired ability to make reasonable decisions." *Id.* Whiteside's notes—as in other

2   progress notes from this period—are inconsistent as to auditory hallucinations, with one section

3   reading "Hallucinations: Denied None evidenced," while another section states that A.P. "presents

4   with depression and auditory hallucinations." *Id.* at 700–01.

5         On July 9, 2015, Dr. Sakhai completed a "mental residual functional capacity

6   questionnaire" indicating that A.P. had severe major depressive disorder with psychotic features,

7   causing symptoms including headaches, sad affect, memory and concentration problems, and

8   hallucinations. *Id.* at 841–42. Dr. Sakhai indicated that A.P. had "No Useful Ability to Function"

9   with respect to remembering work-like procedures, maintaining attention for two hours at a time,

10   maintaining regular and punctual attendance, and completing a normal workday without

11   interruption due to psychological symptoms, that he was "Unable to Meet Competitive Standards"

12   with respect to most of the other work-related mental abilities included in the form, and that his

13   impairments or treatment would cause him to miss work more than three times per month. *Id.* at

14   844. Dr. Sakhai assessed three episodes of decompensation lasting at least two weeks within the

15   previous twelve months, as well as marked limitations in activities of daily living; maintaining

16   social functioning; and concentration, persistence or pace. *Id.* at 845. Dr. Sakhai reported that

17   A.P.'s impairments were not caused by substance intoxication, dependence, or withdrawal, and

18   twice indicates that his symptoms would remain as severe in the absence of substance use. *Id.* at

19   842.

20         A January 27, 2016 treatment note from nurse practitioner Douglas Frey, in the context of

21   a tuberculosis screening, states that A.P. was "still drinking heavily" and should consider quitting

22   alcohol. *Id.* at 891–92.

23         A.P. was admitted to Woodroe Place Crisis Residential for the second time on February

24   10, 2016 and stayed through at least February 22, 2016 after experiencing "decompensation due to

25   excessive alcohol drinking, non-compliance with medication, fighting with others and various

26   situations [that he] refused to discuss." *See id.* at 1090–1107. A.P. reported that he heard voices,

27   most recently one week before his admission to Woodroe Place, and that he sought help because

28   he "knew [he] was losing [his] mind." *See id.* A.P. showed some improvement during that period

1   and expressed interest in pursuing treatment, but isolated himself at times, *e.g.*, *id.* at 1098 (Feb.

2   15, 2016), and "continue[d] to struggle with staying sober," *id.* at 1106 (Feb. 21, 2016).  A.P.'s

3   treatment notes throughout this stay at Woodroe Place indicate a GAF score of 35, reflecting

4   serious impairments.  *Id.* at 1090–1107.

5        At a December 2016 office visit, BACS psychiatrist Dr. Eunjoo Justice, M.D., reported

6   depression, anxiety, and hallucinations, assessed a GAF score of 38, and reported that A.P.'s

7   highest GAF score in 2016 was 48.  *Id.* at 1068.  A.P. stated that he needed medication to control

8   the voices that he heard, *id.* at 1065, and Dr. Justice wrote that A.P.'s current medications were

9   "somewhat effective," *id.* at 1067.  Dr. Justice indicated that A.P. used alcohol but did not use

10  other drugs at that time.  *Id.* at 1066.

11       Dr. Sakhai completed another evaluation form on March 7, 2017.  *Id.* at 868.  Some pages

12  of this form are difficult to read in the record provided to the Court, but Dr. Sakhai reported that

13  "cognitive behavioral, solution-focused, and supportive psychotherapy have not been effective in

14  reducing symptoms."  *Id.* at 866.  Dr. Sakhai assessed marked or extreme limitations in a number

15  of categories.  *Id.* at 866–67.  According to Dr. Sakhai, A.P. was not abusing alcohol or drugs at

16  that time, he would miss four or more days of work per month as a result of his impairments or

17  treatment, and he would be off task for more than 30% of a typical workday.  *Id.* at 867.  Dr.

18  Sakhai checked a box indicating that the effects of A.P.'s impairments were not expected to

19  fluctuate over time, explaining that his "response to treatment has been consistently very slow and

20  very minimal."  *Id.* at 868.

21       **B.   Administrative Hearing**

22       A.P. appeared with an attorney for a hearing before ALJ Arthur Zeidman on March 15,

23  2017.  *Id.* at 44.  A.P. testified that he does not have a driver's license, at one point received

24  training in disposal of hazardous materials, and recalled some but not all of the jobs that Social

25  Security records indicated he had held.  *Id.* at 49–53.  A.P. and the ALJ discussed the degree of

26  physical labor required in A.P.'s past work in warehouses, as a janitor, and as a security guard, as

27  well as his use of computers and other equipment in those roles.  *Id.* at 54–59.

28       A.P. testified that he is "not good with people," *id.* at 59, and that his "hard background"

United States District Court
Northern District of California

growing up left him "emotionally very sensitive," *id.* at 61. A.P. had verbal disagreements with supervisors, but never physical altercations and never anything that cause a warehouse to ask him not to come back. *Id.* at 61. When he was homeless in 2005, A.P. started hearing voices and "just broke down," which he testified happened "all the times [he has] been homeless." *Id.* A.P. was still working during some of the time since he started hearing voices, but testified that he was not able to keep up with his jobs and taking his medication. *Id.* at 62–64. A.P. quit his most recent job because he was depressed and stopped going to work. *Id.* at 64. He was offered a job but turned it down because he did not feel he could be a good worker, and believed he would only lose the job. *Id.*

Despite A.P.'s doctors changing and increasing his medication, he "hasn't been getting any better," and still has weeks of severe depression where he stays home, declining invitations from his cousins to get out:

> Like a have a week, two weeks I'm in the house depressed not watching TV, not doing nothing, can't eat, can't sleep, just staring at the walls. And I just -- it seems like my will to just do anything is gone. I try to make myself wash my hair, wash my clothes, take a shower and it's just like my will isn't -- isn't there. It's like I'm dead inside and it's hard -- it's hard  -- it's hard to do anything.

*Id.* at 65. A.P. testified that he has been seeing therapists on schedules ranging from weekly, to monthly, to periods of six weeks or more. *Id.* at 65–66.

The ALJ highlighted a treatment note from 2014 indicating that A.P. was drinking occasionally and would drink two twenty-four-ounce bottles of malt liquor, which the ALJ characterized as "a lot," to which A.P. responded that "it depends what your tolerance is" and "it's not a lot to [him]." *Id.* at 66–67. A.P. stated that he drank to self-medicate "before [he] got the pills and stuff like that" in order to avoid hearing voices. *Id.* at 67. The ALJ concluded his examination of A.P. by noting his use of cocaine, which A.P. characterized as "experimental" rather than sustained:

> Q: Okay. And then another time, this was Exhibit 4F, you said you had a history of in addition to alcohol also using cocaine, a substance abuse history. And at that point in 2014 you said you had used it about a month before.

1  A: Yeah.

2  Q: So when you're talking about self-medication, there's alcohol,
3  there's cocaine.

4  A: Um-hum, but I don't -- that was like -- if I did it before I -- I did it.
   I don't -- I don't really do drugs. I mean I drink, but I don't do drugs.

5  Q: Okay.

6  A: So that was just like, you know, probably a one time --

7  Q: Okay.

8  A: -- thing and then probably -- prior to that it probably was probably
9  like maybe six months or eight months before. So it was just
   experimental stuff.

10  *Id.* at 67–68.

11  In response to questioning from his attorney, A.P. testified that he struggled with

12  depression and anxiety, and sometimes slept all day or stayed up all night. *Id.* at 68–69. His

13  medication helped to some degree, but he still experienced symptoms, including hallucinations

14  while shopping. *Id.* at 70 ("[I]t's like I hear people talking about me and I don't hear their lips

15  moving but it seems like they're talking about me."). He testified that his medication has changed

16  frequently "[b]ecause they can't find the right one" and he "still suffered the same symptoms." *Id.*

17  at 78. He avoids stores and public transportation, and instead walks on back streets where he is

18  unlikely to encounter other people. *Id.* at 70.

19  A.P. testified that, when employed, he had difficulty keeping his mind on his work and

20  remembering instructions from supervisors. *Id.* at 71. He recalled an incident where he was

21  unable to consistently attend work at a fast food restaurant because he was homeless and often had

22  no place to shower. *Id.* at 72–73. He also recounted a "bad spell" in which, despite taking his

23  medication, he heard voices telling him to break car windows and hurt people, which only

24  subsided when he physically assaulted a stranger. *Id.* at 73–74. A.P. testified that he has

25  attempted suicide by taking pills. *Id.* at 74. A.P. stated that he does not have symptoms when he

26  is drinking, and that he has continued to have symptoms—including debilitating depression and

27  hearing voices—during periods where he has stopped drinking and taken his medication. *Id.* at

28  74–75.

9

United States District Court
Northern District of California

1    Vocational expert Roxane Minkus (the "VE") asked the ALJ and A.P. to clarify some

2  aspects of his past work, including the amount of weight he was required to lift, the nature of his

3  work as a forklift driver, and whether he had learned the skills required to work as security guard

4  in the time that he did so.  *Id.* at 80–88.  The VE assigned exertion levels and job titles from the

5  Dictionary of Occupational Titles to A.P.'s past work.  *Id.* at 88–90.  The VE testified that

6  employers could "easily" tolerate one absence from work per month by a hypothetical person of

7  A.P.'s age, education, and work experience who had no other limitations beyond that absence.  *Id.*

8  at 90–91.  Presented with a second hypothetical with more restrictions, the VE testified that two

9  absences from work per month would eliminate some but not all jobs, while three days per month

10 would eliminate most jobs and is an appropriate "cutoff."  *Id.* at 91–93.  The VE testified that an

11 inability to respond appropriately to coworkers, supervisors, and the public due to hearing voices

12 would eliminate some but not all jobs, with more jobs eliminated where the inappropriate response

13 takes the form of aggression.  *Id.* at 93–96.  The VE testified that the acceptable amount of time an

14 employee could be off task would range from fifteen percent to twenty-five percent of the

15 workday depending on the job.  *Id.* at 98–99.

16    At the conclusion of the hearing, the ALJ acknowledged that "the emotional problems that

17 [A.P. has] suffered have got in the way," but the ALJ stated that he was "going to have to analyze

18 the effects of drug and alcohol on that whole thing and figure out where it all fits in."  *Id.* at 101.

19    **C.    Five Step Framework for ALJ Decisions**

20    When a claimant alleges a disability and applies for Social Security benefits, the ALJ

21 evaluates their claim using a five-step process.  20 C.F.R. § 404.1520(a)(4).  At step one, if the

22 claimant has engaged in "substantial gainful activity" during the alleged period of disability, they

23 are not disabled.  20 C.F.R. § 404.1520(a)(4)(i).  Substantial gainful activity is "work activity that

24 involves doing significant physical or mental activities . . . for pay or profit."  20 C.F.R.

25 § 220.141(a)–(b).  If the claimant has not engaged in such activities, the evaluation continues at

26 step two.

27    At the second step of the analysis, if the claimant has no "severe medically determinable

28 impairment," they are not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  Impairments are severe when

1   there is "more than a minimal limitation in [the claimant's] ability to do basic work activities."  20

2   C.F.R. § 404.1520(c).  If the claimant does not suffer from a severe impairment, they are not

3   disabled; if they have a severe impairment, the evaluation continues to step three.

4        Next, the ALJ turns to the Social Security Administration's listing of severe impairments

5   (the "Listing").  *See* 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's alleged impairment meets

6   or medically equals the definition of a listed impairment, the claimant is disabled.  20 C.F.R.

7   § 404.1520(a)(4)(iii).  If not, the evaluation proceeds to step four.

8        At step four, if—based on the claimant's residual functional capacity ("RFC")—the

9   claimant can still perform their past work, they are not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

10   The RFC is a determination of "the most [the claimant] can do despite [the claimant's]

11   limitations."  20 C.F.R. § 404.1520(a)(1).  If the ALJ finds that the claimant can perform their past

12   relevant work, they are not disabled; if they are not able to perform such work, the evaluation

13   moves to step five.

14        For the fifth and final step, the burden shifts from the claimant to prove disability to the

15   Commissioner to "identify specific jobs existing in substantial numbers in the national economy

16   that the claimant can perform despite [his] identified limitations."  *Meanel v. Apfel*, 172 F.3d

17   1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the

18   Commissioner can identify work that the claimant could perform, they are not disabled; if not, the

19   claimant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

20        **D.    The ALJ's Decision**

21        At the first step of his analysis, the ALJ determined that A.P. was not disabled through

22   November of 2013 because he had worked in a warehouse and as a janitor during that time,

23   earning more than the threshold for substantial gainful activity.  AR at 30–31.  The ALJ

24   determined that A.P. had not engaged in substantial gainful activity after that date.  *Id.* at 31.

25        At the second and third steps, the ALJ concluded that A.P. had two severe impairments—

26   major depressive disorder and polysubstance abuse disorder—but his impairments did not meet or

27   equal the severity of a listed impairment.  *Id.*  The ALJ found that A.P.'s impairments caused only

28   "mild limitations in the ability to understand, remember, or apply information; moderate

United States District Court
Northern District of California

11

difficulties in the ability to interact with others; mild to moderate difficulties in maintaining the ability to concentrate, persist, or maintain pace; and no evidence of difficulties in the ability to adapt or manage oneself." *Id.* Because the ALJ did not find at least two "marked" limitation or one "extreme" limitation in those categories, the ALJ determined that A.P. did not meet Paragraph B of Listing 12.04, encompassing depression. *Id.* The ALJ stated without further explanation that "the evidence fails to establish the presence of the 'paragraph C' criteria." *Id.*

The ALJ assessed A.P.'s RFC as follows:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to hearing and understanding simple oral instructions and to communicating simple information. He could not work at unprotected heights, around moving machinery or operating a motor vehicle. He is limited to work that is simple, routine, and repetitive that is not at a production rate (for example, assembly work). He is limited to simple work-related decisions. He occasionally could respond appropriately to supervisors, co-workers, and the public. He would be absent from work two days per month.

*Id.* at 32.

In reaching that determination, the ALJ concluded that although A.P.'s impairments reasonably could be expected to cause his reported symptoms, "these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 33. The ALJ did not identify particular portions of A.P.'s testimony or other reports that were not credible, nor did he provide specific reasons for discounting A.P.'s credibility other than the vague assertion that his alleged symptoms were "not entirely consistent" with the record. *See id.*

The ALJ acknowledged that "[p]sychological evaluations noted depressive symptoms but some evaluators found the claimant no more than moderately limited while others found more severe limitations." *Id.* He noted instances in the record where A.P. reported that treatment and medication were helpful, and instances of "essentially benign treatment notes," including when A.P. was incarcerated in November of 2013. *Id.* The ALJ also noted that A.P. failed to attend the consultative examination arranged by the state agency. *Id.* at 34.

The ALJ recounted Dr. Kalich's report, but determined that it lacked "probative value as to [A.P.'s] residual functional ability in the absence of drugs and alcohol" because Dr. Kalich "did

United States District Court
Northern District of California

1   not distinguish between the effects of the psychological disorder and the substance use." *Id.* at

2   33–34.  The ALJ assigned "good weight" to nurse practitioner Whiteside's conclusion that A.P.

3   "would have serious difficulties with many work activities, but no work activities were

4   precluded," but failed to address Whiteside's opinions that A.P. would miss four days of work per

5   month and that his impairments would be equally severe in the absence of substance use.  *Id.* at

6   34.  The ALJ rejected Dr. Sakhai's 2017 report as "not well supported by the treatment notes

7   indicating that [A.P.] was doing well or by any discussion of the effects of the drug and alcohol

8   use."  *Id.*  According to the ALJ, a finding of mild to moderate severity is consistent with

9   treatment notes from May of 2014.  *Id.*

10          The ALJ determined that reports of severe limitations from A.P.'s February 2016 crisis

11   residential treatment had "little probative value" because they "reflect only a snapshot of [his]

12   ability when he was first seen after excessive alcohol use and is not a true reflection of the most he

13   could do once the acute symptoms resolved with treatment and adherence to medications," noting

14   that A.P. improved with treatment and abstinence from substances, although the ALJ did not note

15   specifically that A.P. was treated at a residential crisis facility.  *Id.*  The ALJ also noted that, while

16   there was "no period during which [A.P.] likely was not using drugs and alcohol," A.P. was able

17   to maintain employment from February 2013 to November 2013 with occasional drug and alcohol

18   use, and thus should be able to work if he holds himself to moderate—as opposed to "acute and

19   intense"—use of drugs and alcohol.  *Id.* at 34–35.

20          Whether the ALJ ultimately considered A.P.'s substance use material to his decision is

21   unclear.  He concluded as follows:

22             Even if the alcohol and drug use was material to a finding of
              disability, that would not change the overall outcome of the case.
23             With intense drugs and alcohol, the severity of his symptoms might
              have met or equaled the requirement of a listing or precluded regular
24             work activity. Therefore, taking into consideration the drugs and
              alcohol, he likely would have been disabled. However, following the
25             second prong of the DAA [i.e., drug abuse or alcoholism] analysis,
              with the absence or near-absence of the drugs and alcohol, as in 2013,
26             the claimant was able to sustain work activity, so a finding of
              disability would be precluded (SSR 132p). Therefore, the claimant
27             did not meet his burden to demonstrate that whether or not he was
              using drugs and alcohol, he has been disabled.

28

13

1    *Id.* at 35.

2        It is not clear whether the ALJ credited A.P.'s testimony that he experienced auditory

3    hallucinations, or the reports to that effect from a number of his treatment providers.  The ALJ

4    noted "hearing voices" as one of A.P.'s alleged symptoms, but did not address the issue further.

5    *See id.* at 32.  The ALJ acknowledged only that A.P. "has some symptoms of depression,

6    including some impaired concentration and memory, which would affect his ability sustain work."

7    *Id.* at 35.

8        Taking into account the VE's testimony, the ALJ determined that A.P. could perform his

9    past work as a warehouse worker, cleaner, and hand packager, and thus concluded at step four of

10   the five-step analysis that A.P. was not disabled.  *Id.* at 36.

11       **E.    The Parties' Arguments**

12           **1.    A.P.'s Motion for Summary Judgment**

13       A.P. argues that the ALJ erred in wholly failing to address Dr. Sakhai's November 2014

14   opinion.  Pl.'s Mot. (dkt. 23) at 7–8.  A.P. also argues that the ALJ failed to provide sufficient

15   reasons for rejecting Dr. Sakhai's July 2015 opinion, *id.* at 8–11, and March 2017 opinion, *id.* at

16   11–14.  According to A.P., while the ALJ purported to give "good weight" to nurse practitioner

17   Whiteside's opinions, the ALJ erred in failing acknowledge: (1) Whiteside's diagnosis of PTSD;

18   (2) Whiteside's assessment that A.P. would miss four days of work per month; (3) Whiteside's

19   determinations that A.P.'s impairments were not caused by substance use and that his symptoms

20   would remain as severe in the absence of substance use; (4) Whiteside's assessment that A.P.

21   would be "seriously limited" in a number of abilities; (5) Whiteside's conclusion that A.P. had a

22   "marked" limitation in concentration, persistence, or pace; and (6) Whiteside's report that A.P.

23   had experienced episodes of decompensation.  *Id.* at 14–18.  A.P. contends that the ALJ also erred

24   in cherry picking portions of Dr. Kalich's evaluation while misrepresenting both the extent of, and

25   Dr. Kalich's consideration of, A.P.'s drug and alcohol use, *id.* at 18–22, and that the ALJ

26   understated the severity of A.P.'s symptoms during his inpatient treatment at Woodroe Place and

27   failed to account for Dr. Justice's December 2016 assessment, *id.* at 22–25.

28       Taken together, A.P. argues that the "ALJ erred by disregarding, undervaluing, and

1  effectively rejecting every treating and examining opinion in the record," *id.* at 25, with those

2  errors including failing to meet the high standard to reject disability based on drug and alcohol

3  use, *id.* at 25–27,[3] wrongly determining that A.P.'s impairment met no listing, *id.* at 27, and

4  determining that A.P.'s residual functional capacity would allow him to work, *id.* at 28.  A.P. asks

5  the Court to remand for an award of benefits based on the Ninth Circuit's "credit-as-true" rule.  *Id.*

6  at 29.

7  **2.  The Commissioner's Motion to Remand**

8  Rather than file a motion for summary judgment to affirm the ALJ's decision, the

9  Commissioner moves to remand for further administrative proceedings.  *See generally* Def.'s Mot.

10  (dkt. 28).  The Commissioner specifically concedes error with respect to the ALJ's failure to

11  explain conflicts between the residual functional capacity he assessed and aspects of nurse

12  practitioner Whiteside's opinions, despite stating that he afforded Whiteside's opinions "good

13  weight."  *Id.* at 1.

14  The Commissioner preserves his objection in principle to the Ninth Circuit's credit-as-true

15  rule, but does not dispute that this Court is bound by that precedent.  *Id.* at 2 & n.3.  The

16  Commissioner argues that even under the Ninth Circuit's framework, however, remand for an

17  award of benefits should be a rare exception, and further proceedings are necessary here to

18  determine whether A.P.'s impairments were caused by his drug or alcohol use, which some of

19  A.P.'s treatment providers noted as contributing to his impairment and others "failed to

20  acknowledge."  *Id.* at 2–4.  The Commissioner also argues that the Court cannot credit treating

21  physicians' opinions regarding A.P.'s limitations as true because those opinion conflict with the

22  state agency doctors' opinions, which were consistent with the ALJ's conclusions even though the

23  ALJ "did not address" them.  *Id.* at 4–5.  The Commissioner further contends that the credit-as-

24  true rule is inappropriate in light of a handful of "benign mental status examination findings"—

25  including an incident where A.P. "was arrested and off his medications"—and in light of the

26

27  [3] Going forward and in future cases, Plaintiff's counsel is admonished to comply with the twenty-
28  five-page limit for motions or, in exceptional circumstances, to seek leave to file additional pages.  *See* Civ. L.R. 7-2(b).

1    ALJ's determination that A.P. himself was not credible and not consistently compliant with his

2    medication.  *Id.* at 6–7.  The Commissioner notes that disability benefits may not be awarded

3    solely due to error by the Social Security Administration, but instead require a showing that the

4    claimant is actually disabled.  *Id.* at 7 (citing *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir.

5    2015)).

6                    **3.    A.P.'s Reply**

7            A.P. argues in his reply brief that the outcome the Commissioner seeks here "is precisely

8    the type of carte blanche 'do-over' that the credit-as-true rule is designed to prevent."  Reply (dkt.

9    29) at 4.  According to A.P., the Commissioner's only basis for remand is to allow an ALJ to

10   revisit the medical opinion evidence that the ALJ failed to consider properly the first time, which

11   is not permitted under Ninth Circuit precedent.  *See id.* at 3–4.  A.P. notes that Dr. Sakhai assessed

12   marked limitations in a number of categories and determined that his impairments are *not* caused

13   by substance use, and argues that the opinions of nurse practitioner Whiteside, Dr. Kalich, and

14   other treatment providers support those conclusions.  *Id.* at 4–5.  A.P. contends that, in the absence

15   of *any* treating or examining doctor's opinion that his impairments would be diminished if he did

16   not use drugs or alcohol, the record cannot support a conclusion that substance use is a

17   contributing factor in his disability, particularly in light of the stringent standard required to

18   support such a conclusion and deference afforded to treatment providers under Social Security

19   Ruling 13-2p.  *See id.* at 5–6, 8–10.

20   **III.    ANALYSIS**

21           **A.    Legal Standard**

22           District courts have jurisdiction to review the final decisions of the Commissioner and may

23   affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

24   hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

25           When reviewing the Commissioner's decision, the Court takes as conclusive any findings

26   of the Commissioner that are free of legal error and supported by "substantial evidence."

27   Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

28   conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401

United States District Court
Northern District of California

16

1   (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a

2   preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

3   1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial

4   evidence, the decision should be set aside if proper legal standards were not applied when

5   weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v.*

6   *Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider

7   both the evidence that supports and the evidence that detracts from the Commissioner's

8   conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

9   F.2d 993, 995 (9th Cir. 1985)).

10          If the Court identifies defects in the administrative proceeding or the ALJ's conclusion, the

11   Court may remand for further proceedings or a calculation of benefits.  *See Garrison v. Colvin*,

12   759 F.3d 995, 1019–21 (9th Cir. 2014).  "When the ALJ denied benefits and the court finds error,

13   the court ordinarily must remand to the agency for further proceedings before directing an award

14   of benefits." *Leon*, 880 F.3d at 1045 (citing *Treichler*, 775 F.3d at 1099).  "[A]n ALJ's failure to

15   provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does

16   not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d

17   at 1106.  In appropriate circumstances, however, the court may order immediate award of benefits

18   under the Ninth Circuit's "credit-as-true" rule. *Leon*, 880 F.3d at 1045 (citing *Garrison*, 759 F.3d

19   at 1019).

20          The district court may remand to the ALJ to calculate and award benefits when: (1) "the

21   ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony

22   or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability

23   determination can be made" and "further administrative proceedings would [not] be useful"; and

24   (3) "on the record taken as a whole, there is no doubt as to disability."  *Leon*, 880 F.3d at 1045

25   (citations and internal quotation marks omitted); *Varney v. Sec'y of Health & Human Servs.*, 859

26   F.2d 1396, 1401 (9th Cir. 1988) (emphasizing that the credit-as-true rule applies to both claimant

27   testimony and medical opinion evidence); *see also Garrison*, 759 F.3d at 1021 (holding that a

28   district court abused its discretion in declining to apply the "credit as true" rule to an appropriate

United States District Court
Northern District of California

1   case).  The credit-as-true rule does not apply "when the record as a whole creates serious doubt as

2   to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

3   *Garrison*, 759 F.3d at 1021, when "there is a need to resolve conflicts and ambiguities," *Treichler*,

4   775 F.3d at 1101, or when there is ambiguity about when the claimant's disability began that is not

5   solved by the record credited as true.  *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015).

6   This credit-as-true rule, which is "settled" in the Ninth Circuit, *Garrison*, 759 F.3d at 999, is

7   intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce

8   delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating

9   conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney*, 859 F.2d at 1398–

10  99).

### B.   The Credit-as-True Rule Warrants an Award of Benefits

12          The Commissioner does not dispute that the ALJ erred in failing to address the aspects of

13  nurse practitioner Whiteside's opinions that conflict with the ALJ's conclusions, but argues that

14  the Court should remand for further proceedings rather than an award of benefits because A.P.'s

15  "undisputed substance abuse, the conflicting medical opinions and evidence, and the ALJ's

16  discussion of [A.P.'s] subjective statements all represent outstanding conflicts in the record that

17  preclude a judicial finding of disability."  Def.'s Mot. at 28.  The Commissioner does not

18  specifically address whether the ALJ erred in rejecting or failing to address opinions of Dr.

19  Sakhai, Dr. Kalich, and Dr. Justice.

20          No party disputes that the Commissioner would be required to find A.P. disabled if Dr.

21  Sakhai's opinions that he would miss more than three days or at least four days of work per

22  month, AR at 842, 867, or Whiteside's opinion that he would miss four days of work per month,

23  *id.* at 847, were taken as true.  The Commissioner has identified no medical opinion in the record

24  contradicting those opinions.  The Court does not reach the question of whether the Ninth

25  Circuit's credit-as-true rule can apply to an opinion of a non-physician, "other" source like nurse

26  practitioner Whiteside, because there is no question that it can apply to medical opinions from a

27  treating physician like Dr. Sakhai, and both of those providers' opinions are materially identical

28  with respect to A.P.'s absence from work.  Because the Commissioner has not argued that the ALJ

United States District Court
Northern District of California

1  provided sufficient reasons to reject either of their opinions, the remaining questions are whether

2  further administrative proceedings would be useful,[4] and whether the record as a whole evinces

3  doubt as to disability.  *Leon*, 880 F.3d at 1045.  The Court addresses the Commissioner's

4  arguments as to those issues in turn.

5             **1.**    **Substance Use**

6         First, with respect to A.P.'s substance use, Social Security Ruling 13-2p sets forth the

7  standard for determining when drug abuse or alcoholism ("DAA") is material to a claimant's

8  mental impairment:

9        *7. What do we do if the claimant's co-occurring mental disorder(s)*
10        *improve in the absence of DAA?*

11        a. Many people with DAA have co-occurring mental disorders; that
12  is, a mental disorder(s) diagnosed by an acceptable medical source in addition to their DAA. We do not know of any research data that we
13  can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol.

14        b. To support a finding that DAA is material, we must have evidence
15  in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA.
16  Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder.

17        c. We may purchase a CE in a case involving a co-occurring mental
18  disorder(s). We will purchase CEs primarily to help establish whether a claimant who has no treating source records has a mental disorder(s)
19  in addition to DAA. See Question 8. We will provide a copy of this evidence, or a summary, to the CE provider.

20        d. We will find that DAA is not material to the determination of
21  disability and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental
22  disorder(s) would improve to the point of nondisability in the absence of DAA.

23  SSR 13-2p, 2013 WL 621536, at *9 (Feb. 20, 2013).  Under SSR 13-2p:

24        Periods of abstinence may be considered evidence of whether DAA
25  is material in cases involving co-occurring mental disorders, so long

27  [4] The Commissioner argues only that the case should be remanded for further consideration of the existing record.  *See* Def.'s Mot. at 1.  To the extent that A.P.'s failure to appear for a consultative
28  examination might support an argument that the case should be remanded to conduct such an examination, the Commissioner has waived any such argument by failing to raise it in his motion.

1

2

3
> as the "claimant is abstinent long enough to allow the acute effects of drugs or alcohol abuse to abate." SSR 13-2p(9), 2013 WL 621536, at *12. To find DAA material, there must be evidence demonstrating that any remaining limitations were not disabling during the period. SSR 13-2p(9)(b), 2013 WL 621536, *12.

4  *Wall v. Berryhill*, No. 16-cv-01374-SK, 2017 WL 2901701, at *7 (N.D. Cal. Apr. 24, 2017).

5  Improvement during periods of abstinence in a structure treatment setting is not sufficient; the

6  Social Security Administration "need[s] evidence from *outside* of such highly structured treatment

7  settings demonstrating that the claimant's co-occurring mental disorder(s) has improved, or would

8  improve, with abstinence."  SSR 13-2p, 2013 WL 621536, at *13 (emphasis added).  "In addition,

9  a record of multiple hospitalizations, emergency department visits, or other treatment for the co-

10  occurring mental disorder—with or without treatment for DAA—is an indication that DAA may

11  not be material even if the claimant is discharged in improved condition after each intervention."

12  *Id.*[5]

13          The Commissioner has not explained how the record available here could satisfy that

14  standard for finding A.P.'s substance use material to his disability.  As the ALJ acknowledged,

15  there is no extended period of abstinence documented in the record.  AR at 35.  The period of

16  purportedly reduced usage in 2013 precedes most of the alleged period of disability and all of the

17  period now at issue—A.P. initially alleged disability beginning in February of 2013, but does not

18  contest the ALJ's conclusion that he was not disabled through the end of his employment in

19  November of 2013—and Dr. Kalich's conclusion in 2014 that A.P.'s symptoms had worsened

20  over time, *id.* at 695, is not contradicted in the record.  It is also not entirely clear how the ALJ

21  reached the conclusion that A.P.'s substance use was more moderate during that period or whether

22  such a conclusion can be supported by the record.  The ALJ notes that A.P. described his use as

23  "intermittent" during that time, but A.P. also reported only intermittent use during much of his

24  alleged period of disability when he was not working.  It appears that the ALJ might have

25

26  ───────────────

27  [5] A.P. also relies on a section of SSR 13-2p acknowledging that "[t]reating sources, especially specialists, may have the best understanding of . . . the extent to which the other impairment(s) would likely improve absent DAA," but that language appears in a section addressing physical

28  impairments, which is not applicable to A.P.'s claim based on mental impairment.  *See* SSR 13-2p, 2013 WL 621536, at *8.

1    concluded, tautologically, that *because* A.P. maintained employment, his substance use must have

2    been reduced, and therefore his subsequent inability to work was caused by increased substance

3    use.

4            To the extent the ALJ relied on A.P.'s purported recovery after treatment and "apparently

5    abstaining from drugs and alcohol" in February of 2016 to show a material effect of substance use,

6    *id.* at 34, that period of crisis residential treatment was the sort of "highly structured treatment

7    setting" that cannot establish materiality of substance use as compared to abstinence under SSR

8    13-2p, because the effects of the structured setting and treatment cannot be decoupled from any

9    beneficial effect of abstinence.  *See* SSR 13-2p, 2013 WL 621536, at *13; AR at 1091–1107.

10   Moreover, notes from that period of treatment indicate that A.P. "continue[d] to struggle with

11   staying sober," *id.* at 1106, calling into question whether he was in fact abstaining from substance

12   use at that time.

13           Contrary to the Commissioner's assertion that "none of the providers on whose opinions

14   Plaintiff relies clarified whether they would have assessed the same limitations had Plaintiff

15   refrained from substance abuse," Def.'s Mot. at 4, Dr. Sakhai and nurse practitioner Whiteside

16   both reported that A.P.'s impairments would remain as severe in the absence of substance use, AR

17   at 842, 847, 867.  And contrary to the Commissioner's assertion that Whiteside and Dr. Sakhai

18   "wholly failed to acknowledge [A.P.]'s substance abuse," Def.'s Mot. at 4, both documented his

19   substance use in their treatment notes.  *See, e.g.*, AR at 805 (progress note by Dr. Sakhai reporting

20   that A.P. "spoke about his struggle with alcohol and using at as self-medication"); *id.* at 834

21   (initial assessment form by Dr. Sakhai noting A.P.'s drug and alcohol use); *id.* at 907 (note by

22   Whiteside stating A.P. "reported that he has been continuing to drink and smoke mj").  The record

23   does not support a conclusion that either Whiteside's or Dr. Sakhai's opinion that A.P.'s

24   symptoms would be as severe in the absence of substance use was based on a lack of knowledge

25   of such use.

26           Dr. Kalich's opinions that "[c]hronic use of alcohol likely exacerbated [A.P.'s] feelings of

27   depression" and "his intermittent use of cocaine may also intensify fluctuations in his mood" do

28   not go so far as stating that he would be able to sustain regular attendance at work without his

United States District Court
Northern District of California

21

United States District Court
Northern District of California

substance use, particularly given Dr. Kalich's conclusions that "it is unlikely that his symptoms are the sole product of his use" because they "have persisted during periods of reported sobriety and decreased use," and that he "is unlikely to be able to adhere to a typical work schedule. *Id.* at 694. State agency consulting psychiatrist Dr. Covey reported that A.P. suffered from substance addiction, *id.* at 112, but—presumably familiar with the Social Security Administration's analytical framework for DAA materiality—concluded that "[t]here is no evidence of any substance abuse disorder/DAA issue," *id.* at 116. Drs. Williams and Ahmed reached the same conclusions on reconsideration. *Id.* at 141, 145.

Viewing the record as a whole, there is no medical opinion evidence that A.P. would have a greater ability to maintain regular attendance but for substance use. Even if there were, the Commissioner could not rely on such an opinion under SSR 13-2p, which acknowledges the lack of "research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol." SSR 13-2p, 2013 WL 621536, at *9. Because the current record would not support a finding that A.P.'s drug and alcohol use were material to his impairments under the Social Security Administrations rules for such analysis, the Court finds no need for further proceedings to allow an ALJ to reconsider that issue.

### 2.    Conflicts in the Record

The Commissioner contends that Whiteside's opinions that A.P. would not be entirely precluded from any work activities "seems to conflict" with his opinion that A.P. would be absent from work four days per month. Def.'s Mot. at 5. Taken as a whole, Whiteside's opinion was that A.P.'s impairments would not entirely preclude him from working *when he attended work*, but he would be absent from work four days per month. AR at 847–50. The amount of absence that an employer would tolerate does not fall within Whiteside's area of expertise as a nurse practitioner. The VE, whose expertise encompasses such issues, testified that missing three or more days per month would preclude work. *Id.* at 91–93. The Court discerns no meaningful conflict.

The Commissioner also cites the non-examining state agency doctors' opinions regarding the severity of A.P.'s impairments—specifically, that they were less severe than assessed by his

United States District Court
Northern District of California

1    treatment providers—as conflicts requiring remand.  Def's Mot. at 5.  None of the consultants

2    addressed whether A.P. could maintain regular attendance with fewer than the four-or-more

3    monthly absences predicted by Whiteside and Dr. Sakhai.  "[T]he opinion of a treating physician

4    is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an

5    examining physician is entitled to greater weight than that of a non-examining physician."

6    *Garrison*, 759 F.3d at 1012.  The non-examining consultants' assessment of generally less severe

7    symptoms would not be a sufficient basis on remand to reject a treating physician's opinion on

8    absences from work, an issue the consultants did not specifically address

9         The remaining "inconsistencies" identified by the Commissioner are merely instances

10   where A.P.'s symptoms did not present as particularly severe.  *See* Def.'s Mot. at 6.  Addressing

11   an ALJ's decision to reject a claimant's symptom testimony on similar grounds, the Ninth Circuit

12   has held that the claimant's testimony of intermittently severe symptoms should be credited as true

13   despite instances where his symptoms were less severe:

14             It is an error to reject a claimant's testimony merely because
               symptoms wax and wane in the course of treatment.  Cycles of
15             improvement and debilitating symptoms are a common occurrence,
               and in such circumstances it is error for an ALJ to pick out a few
16             isolated instances of improvement over a period of months or years
               and to treat them as a basis for concluding a claimant is capable of
17             working.

18   *Garrison*, 759 F.3d at 1017.  Fluctuations in the severity of A.P.'s symptoms are not inconsistent

19   with periods of severe symptoms where he would be absent from work, as assessed by nurse

20   practitioner Whiteside and Dr. Sakhai.

21        **3.    A.P.'s Credibility**

22        Finally, the Commissioner argues that further proceedings are appropriate and the case

23   cannot be remanded for benefits because the ALJ found A.P. himself not credible as to the severity

24   of his symptoms.  *See* Def.'s Mot. at 6–7.

25        While not raised in A.P.'s briefs as a basis for reversal, the ALJ's analysis A.P.'s

26   credibility did not comport with Ninth Circuit precedent.[6]  In any event, the Ninth Circuit case on

27   _____

28   [6] A.P.'s present motion does not challenge the ALJ's assessment of A.P.'s own testimony, and the

which the Commissioner relies held only that a district court did not abuse its discretion in

denying a request to award benefits and instead remanding for further proceedings where the

plaintiffs' claims were not only "undercut by the ALJ's adverse credibility determination, which

was supported by evidence of skepticism on the part of her physicians about her claims of

limitations as well as by inconsistent reports from [the plaintiff] herself," but also by

inconsistencies in the treatment notes of the doctor whose opinion the plaintiff argued should be

credited, inconsistencies with other treating physicians' opinions, and an unresolved issue

regarding her alleged onset date. *Dominguez*, 808 F.3d at 408–09. *Dominguez* did not hold that

an ALJ's finding that a plaintiff is not himself credible precludes applying the credit-as-true rule to

uncontradicted opinions of a treating physician. The Commissioner has not explained why any

question of A.P.'s credibility would undermine Dr. Sakhai's and nurse practitioner Whiteside's

opinions regarding absences from work. The Court declines to require further administrative

proceedings on that basis.

## IV.   CONCLUSION

For the reasons discussed above, the Court concludes that the ALJ failed to provide

sufficient reasons to reject Dr. Sakhai's opinion regarding A.P.'s absences from work, the

Commissioner would be required to find A.P. disabled if that opinion were credited as true, and

there is neither need for further administrative proceeding nor any doubt that A.P. is disabled.

A.P.'s motion is therefore GRANTED, the Commissioner's motion is DENIED, and the case is

REMANDED for calculation and award of benefits for a period of disability beginning at the

---

Court does not rely on that error in resolving the parties' motions. The Court notes, however, that
the Social Security Administration's consistent failure to acknowledge and comply with binding
Ninth Circuit precedent regarding symptom testimony has resulted in countless appeals and
reversals of ALJ decisions, engendering unnecessary delay and public expense. The Ninth Circuit
has repeatedly held that if an ALJ determines that a claimant's medically determinable
impairments could result in the symptoms alleged and does not affirmatively find that the plaintiff
is malingering, the ALJ can only reject the claimant's testimony about the severity of those
symptoms by offering "'specific, clear, and convincing reasons for doing so.'" *Lingenfelter v.
Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th
Cir. 1996)). In presenting such reasons, "'[g]eneral findings are insufficient; rather, the ALJ must
identify what testimony is not credible and what evidence undermines the claimant's complaints.'"
*Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quoting *Lester v. Chater*, 81 F.3d 821, 834
(9th Cir. 1995)). The ALJ's analysis here did not acknowledge or meet those standards.

United States District Court
Northern District of California

termination of A.P.'s employment in November of 2013.  The Clerk shall enter judgment in favor

of A.P.

**IT IS SO ORDERED.**

Dated: September 30, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge